UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
LOUISVILLE DIVISION
CIVIL ACTION NO. 3:04CV-688-R

VICKI TUDOR                                                                                        PLAINTIFF

v.

BELLSOUTH TELECOMMUNICATIONS, INC.                         DEFENDANT

**MEMORANDUM OPINION**

This matter is before the Court on motion for summary judgment (Dkt. # 15) of Defendant Bellsouth Telecommunications, Inc. ("BellSouth"). Plaintiff Vicki Tudor ("Tudor") responded (Dkt. # 36), Defendant replied (Dkt. # 40), and this matter is now ripe for adjudication. For the reasons that follow, the Court **GRANTS** the Defendant's motion.

**BACKGROUND**

Plaintiff Vicki Tudor was employed by BellSouth as a Partner Business Manager ("PBM") in Louisville, Kentucky until April 2001, when she was promoted to Senior BPM. As a Senior BPM, Ms. Tudor managed a number of agents (not BellSouth employees) who worked to sell BellSouth products and services; BellSouth refers to this as "indirect sales." Like all of BellSouth's sales groups, the indirect sales "channel" of which Ms. Tudor was a part is subject to "sales objectives," or quotas, which are set by BellSouth's senior management and are subject to change throughout the course of a year. The sales quotas for each channel were then divided among the various individuals in the channel such that each individual had a sales quota that he or she was required to meet. Senior PBMs, in addition to supervising PBMs, have their own

1

sales quotas which are higher than those given to non-Senior PBMs. As a result, of course, they receive more compensation than do the PBMs.

BellSouth evaluates its sales employees' performance at the mid-year point and at the end of the year. The rating system used to conduct this evaluation includes five "codes:" DN (does not meet criteria), MM (mostly meets criteria), CM (consistently meets criteria), EC (exceeds criteria) and FE (far exceeds criteria). In order for an employee's performance to be considered satisfactory, he or she must achieve a rating of CM or above; that is, a rating of DN or MM is considered unsatisfactory. For a PBM (and for a Senior PBM) to earn a CM rating, he or she must meet his or her assigned sales quota - that is, sell a dollar amount of products and services equal to the amount specified as his or her "sales objective." If a PBM sells only 85% of the quota, he or she receives a rating of MM; anything below that is considered a DN rating. In a performance evaluation, a BPM's sales numbers are subject to two different ratings: one for total sales and one for so-called "strategic sales" or "core and broadband sales" which, apparently, measures specific types of products sold by the BPMs.

As a BPM, Ms. Tudor was successful. In 2000, she achieved sales of 116% of her quota. In April of 2001, she was promoted to Senior BPM, and her quota increased as a result. At the end of 2001, Ms. Tudor had met only 85% of her total sales quota, and less than 85% of her "strategic sales" quota; therefore, she received ratings of MM and DN for those two categories, respectively. In 2002, her sales were slow throughout the year and failed to meet either of the two quotas at the mid-year mark. In December, however, she had unusually strong sales that pushed her total sales up to 104% of her quota, earning her a CM rating (the lowest of the acceptable ratings). It appears that her "core" sales numbers (previously "strategic sales")

were at a similar level.

The beginning of the year 2003 yielded sales that were below expectations, and on her mid-year report Ms. Tudor received ratings of DN in both total and core sales. Although Mr. Graham, an Associate Sales Manager and Ms. Tudor's direct supervisor, expressed concern to her about these results, no action was taken until October 1, 2003. At that time, Ms. Tudor's sales were still well below expectations, so she was placed on a 90-day "Performance Improvement Plan" which set forth specific sales requirements for that time period and listed steps she was to take in order to achieve those sales. Mr. Graham reviewed the plan with Ms. Tudor in person, and she signed it. Ms. Tudor understood the plan and believed she could meet the sales requirements. In November 2003, Mr. Graham conducted a review of Ms. Tudor's progress. At the end of the year, however, she was only at 65% of her yearly quota for total sales and 75% of her quota for core sales, which translated to DN ratings on each at her end-of-year performance review.

Ms. Tudor appealed this review to Assistant Vice President Russ Kane, who reviewed the sales data and discussed the matter with Ms. Tudor and Mr. Graham via conference call. During the conference call, Ms. Tudor attempted to explain her results, but Mr. Kane decided to uphold the review. In light of the significant gap between Ms. Tudor's achievements and BellSouth's expectations, Mr. Kane's supervisor, Vice President Estelle Conover, decided to offer Ms. Tudor the opportunity to voluntarily resign her position under BellSouth's Discretionary Termination Assistance Plan (DTAP). This plan provides severance packages to, among others, employees who appear to be on the path to involuntary termination but who choose instead to voluntarily leave the company. Ms. Tudor's DTAP plan would have entitled her to $27,720.00.

Alternatively, Ms. Tudor was given the opportunity to continue working under the conditions of a Performance Improvement Plan (like the one she had been under in 2003). She chose the latter option.

By the end of the first quarter of 2004, Ms. Tudor was far from being on track to meet her yearly quota. In fact, she had achieved only 1/3 of the sales needed to meet her year-to-date expectations for total sales and less than 1/2 of the sales needed to meet those expectations for core sales. In April, 2004, she was terminated and replaced by Eric Mundy. Thereafter, she went to work at Authorized Communications Group, Inc., where she has been selling BellSouth products.

## STANDARD

Summary judgment is available under Fed. R. Civ. P. 56(c) if the moving party can establish that the "pleadings, depositions, answer to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." In determining whether summary judgment is appropriate, a court must resolve all ambiguities and draw all reasonable inferences against the moving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

[N]ot every issue of fact or conflicting inference presents a genuine issue of material fact." *Street v. Bradford & Co.*, 886 F.2d 1472, 1477 (6th Cir. 1989). The test is "whether the party bearing the burden of proof has presented a jury question as to each element in the case." *Hartsel v. Keys,* 87 F.3d 795, 799 (6th Cir. 1996). The plaintiff must present more than a mere scintilla of evidence. To support his position, he must present evidence on which the trier of fact

could find for the plaintiff. *See id.* (citing *Anderson v. Liberty Lobby*, 477 U.S. 242, 251-52 (1986)). Mere speculation will not suffice to defeat a motion for summary judgment: "[t]he mere existence of a colorable factual dispute will not defeat a properly supported motion for summary judgment. A genuine dispute between the parties on an issue of material fact must exist to render summary judgment inappropriate." *Monette v. Electronic Data Systems Corp.,* 90 F. 3d 1173, 1177 (6th Cir. 1996).

## ANALYSIS

Although Ms. Tudor's complaint alleges a violation of the Kentucky Civil Rights Act, the Kentucky Supreme Court has said that courts applying that Act must interpret it in consonance with Title VII of the Civil Rights Act of 1964. *See Bank One, Ky., N.A. v. Murphy*, 52 S.W.3d 540, 544 (Ky. 2001); *Ammerman v. Bd. of Educ. of Nicholas County*, 30 S.W.3d 793, 797-98 (Ky. 2000); *Brewer v. Hillard*, 15 S.W.3d 1, 10-11 (Ky. App. 1999). The elements of a *prima facie* discrimination claim under the KCRA are the same as those for such a claim brought under Title VII. *Talley v. Bravo Pitino Restaurant*, 61 F.3d 1241, 1250 (6th Cir. 1995). Therefore, the Court will look to case law interpreting and applying Title VII in its evaluation of Ms. Tudor's complaint.

Because the record does not reveal any direct evidence of discrimination, Ms. Tudor must rely on the burden-shifting scheme first articulated in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), and later refined by *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248 (1981), to prove her discrimination claim. *Farmer v. Cleveland Public Power*, 295 F.3d 593, 602 (6th Cir. 2002); *see also Turner v. The Pendennis Club*, 19 S.W.3d 117, 119-20 (Ky. App. 2000); *Ky. Ctr. for the Arts v. Handley*, 827 S.W.2d 697, 699 (Ky. App. 1991). Under this

framework, a plaintiff alleging sexual discrimination has the initial burden of establishing a *prima facie* case of intentional sexual discrimination in employment and/or retaliation. *Green*, 411 U.S. at 803. To meet this relatively easy burden, the plaintiff must establish that (1) she is a member of a protected class; (2) she was qualified for the position; (3) she suffered an adverse employment action; and (4) she was replaced by a person outside her protected class, or a person outside her protected class was treated more favorably than she was. *Policastro v. Northwest Airlines, Inc.*, 297 F.3d 535, 538-39 (6th Cir. 2002); *Braithwaite v. The Timken Co.*, 258 F.3d 488, 493 (6th Cir. 2001).

If the plaintiff is able to establish a *prima facie* case, there arises a presumption of discrimination, after which the employer has a "burden of articulation" which requires it to articulate a legitimate nondiscriminatory reason for its action. *Id.*; *Logan v. Denny's, Inc.*, 259 F.3d 558, 567 (6th Cir. 2001). If the employer carries its burden, then the burden shifts back to the plaintiff to prove by a preponderance of the evidence that the articulated reason was actually a pretext for discrimination. *Logan*, 259 F.3d at 567; *Braithwaite*, 258 F.3d at 493. A plaintiff can establish pretext by showing that (1) the stated reason had no basis in fact; (2) the stated reason was not the actual reason; or (3) the stated reason was insufficient to explain the employer's action. *Logan*, 259 F.3d at 567 (citing *Wheeler v. McKinley Enters.*, 937 F.2d 1158, 1162 (6th Cir. 1991)). Pretext cannot be shown unless the plaintiff proves both that the reason was false and that discrimination was the real reason. *Id.* (quoting *St Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 515 (1993)).

The parties agree that Ms. Tudor has established the first and third elements of her *prima facie* case – she is female and her employment with BellSouth was terminated. She has also

presented sufficient evidence that she is qualified for the position, as required by the second prong. Although Defendant argues that she was not qualified based upon the various "unsatisfactory" ratings that resulted in her termination, an event that precipitates the adverse employment action of prong three cannot be used as evidence that the employee was unqualified. *Cline v. Catholic Diocese of Toledo*, 206 F.3d 651, 660-61 (6th Cir. 2000) ("[W]hen assessing whether plaintiff has [shown she was qualified] at the prima facie stage of a termination case, a court must examine plaintiff's evidence independent of the nondiscriminatory reason 'produced' by the defense as its reason for terminating plaintiff."). Those unsatisfactory ratings may indicated poor performance on the part of Ms. Tudor, but they do not alone indicate that she was not *qualified* to occupy her position. Finally, Ms. Tudor has also met the fourth element because she was replaced by a male, Eric Mundy. Since she has presented evidence that she was replaced by a male, she is not required to show that similarly situated males were treated more favorably than she was. *See Clayton v. Meijer, Inc.*, 281 F.3d 605, 609-10 (6th Cir. 2002).

As Ms. Tudor has established a *prima facie* case of discrimination as required under the *McDonnell Douglas/Burdine* scheme, BellSouth is only entitled to summary judgment if it can proffer a legitimate nondiscriminatory reason for its action, and Plaintiff is unable to present sufficient evidence that this reason is pretextual. BellSouth avers that it fired Ms. Tudor for "poor performance," which is a legitimate nondiscriminatory explanation for the company's action. *See, e.g., Shepherd v. Uniboring*, 72 Fed. Appx. 333, 336, 2003 WL 21783604, 2 (6th Cir. 2003). The burden, then, shifts back to Ms. Tudor, who is required to prove by a preponderance of the evidence that the stated reason for her termination was actually a pretext for discrimination. *Logan*, 259 F.3d at 567.

Ms. Tudor makes several arguments in rebuttal.  One appears to be a challenge to the basis in fact of BellSouth's assertion that Ms. Tudor was performing poorly.  Ms. Tudor mentions several awards and positive reviews she received.  For example, she asserts that she "has undisputably shown that, in general her numbers do not reflect poor performance." (Dkt. # 36, at 10).  In an earlier portion of her response, Ms. Tudor also says that "[t]o have an employee involuntarily terminated after receiving numerous sales achievement awards and attaining her sales quotas contradicts common sense.  Logic would tell you that if an employee is repeatedly awarded for their [*sic*] efforts as a salesperson they should not be terminated for poor performance."  (*Id.* at 4).  A preponderance of the evidence simply does not support the assertion that there was no factual basis to support BellSouth's determination that Ms. Tudor's performance was inadequate.  That Ms. Tudor has adduced some evidence that she was a good employee (she received an award for "demonstrating integrity, courage and conviction" (*Id.*); several of the PBMs working under Ms. Tudor received awards for sales achievement (*Id.*)) is insufficient to meet the preponderance of the evidence standard.  Those facts cannot overcome the repeated, and significant, failures on her part to meet her sales quotas.

Ms. Tudor makes several other arguments to support her assertion that her termination was effected on a pretextual basis.  Each of them consists of Ms. Tudor comparing BellSouth's actions with regard to her failure to meet her quotas with the actions BellSouth took against male employees.  For her comparison of other employees' situations to her own to successfully establish pretext, Plaintiff must show that "other nonprotected employees were not fired even though they engaged in substantially identical conduct to that which the employer contends motivated its discharge of the plaintiff."  *Hollins v. Atlantic Co.*, 188 F.3d 652, 661 (6th Cir.

1999) (citation, quotation marks, and alterations omitted).  The plaintiff must also establish that the male employees to which she compares herself were "similarly-situated *in all respects*." *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 583 (6th Cir. 1992) (emphasis in original), *see also Braithwaite*, 258 F.3d at 497.

There are three such employees discussed by Ms. Tudor in her response. One is Mr. Donald Mattox, who was employed as a PBM.  Ms. Tudor alleges that Mr. Mattox was treated more favorably than she was in dealing with performance issues (specifically, failure to meet sales quotas) because (1) he received a significant quota reduction in 2003; and (2) the severance package offered to him (which he ultimately accepted) provided a significantly larger severance payment than did the one offered to Ms. Tudor.[1]  As to the quota reduction, BellSouth avers that the quota reduction stemmed from the fact that "the management of his largest agent was transferred to a BellSouth Master Agent."  (Dkt. # 40, at 5).  Ms. Tudor adduces no evidence to the contrary.  As to the severance package, BellSouth avers that the difference in the two severance packages is a result of the different circumstances under which Mr. Mattox and Ms. Tudor were terminated.  Mr. Mattox, it claims, was terminated because his position was eliminated.  (*Id.* at 7).  Because Mr. Mattox was terminated under those circumstances, he was eligible for a termination package under BellSouth's "Transition Payment Plan for Non-Represented Employees" ("TPP:N").  That plan, by its terms, was not available to employees

---

[1]Ms. Tudor also alleges that Mr. Mattox was not held to the requirements of a 90-day waiting period BellSouth imposes on employees who leave the company before they are allowed to sell BellSouth products and services again.  Because this issue is not directly related to termination, it will not be addressed here.

who were facing involuntary termination for poor performance.[2] For these reasons, and also because Mr. Mattox was a BPM and not a Senior PBM, as was Ms. Tudor, the two are not similarly situated.

Ms. Mattox also seeks to compare her situation to that of Mr. Tim Anito. Like Ms. Tudor, Mr. Anito was a Senior PBM who experienced difficulties meeting sales quotas. Also like her, Mr. Anito was put on a performance improvement plan in fall 2003. (Exhibit D, Attachment # 4 to Dkt. # 40, at 3). Unlike her, Mr. Anito was able to improve his sales performance and successfully met or exceeded the goals set forth in his plan. (*Id.*). Mr. Anito also met his minimum total sales quota for 2004; however, in 2005 he "voluntarily chose to return to the position of PBM because [he] concluded that [his] assigned territory lacked the potential for increased sales." (*Id.* at 4). Also, Ms. Tudor alleges that Mr. Anito was "given a large sale that was originally Rod Potters [*sic*] ... [and] was given ... [an] additional 50 circuit sales by Mr. Graham that were already sold and awaiting installation..." (Exhibit 5 to Dkt. # 36, at ¶ 5). Ms. Tudor has produced no evidence of these transactions, and Mr. Anito denies both (Attachment # 4 to Dkt. # 40, at 3). Further, both would be against BellSouth policy. (*Id.*; Dkt. # 40 at 3).[3] In light of their very different employment histories, the Court finds that Mr. Anito and Ms. Tudor were not similarly situated. Therefore, any difference in their treatment by

---

[2]BellSouth also argues that ERISA pre-empts a claim for benefits pursuant to the TPP:N. Plaintiff does not seek such benefits; rather, she attempts to use BellSouth's offer of a package under the TPP:N to male associates to demonstrate pretext. Therefore, the Court will not address the ERISA pre-emption issue.

[3]Ms. Tudor also alleges that $5000 was "diverted from Ms. Tudor to another salesperson to meet his quota." (Dkt. # 32, at 4). However, Ms. Tudor does not offer any support for this assertion or even name the employee to whom the money was allegedly transferred. It is unclear whether she means Mr. Anito or someone else received it.

BellSouth cannot be used to support Plaintiff's claim of pretext.

In sum, then, Plaintiff has not pointed to another similarly-situated male employee who received more favorable treatment than did she.

Plaintiff's response also contains some allegations relating to BellSouth's treatment of her after her termination. Specifically, Ms. Tudor alleges that BellSouth retaliated against her by enforcing its standing rule that terminated employees are not allowed to sell BellSouth products for 90 days after their separation from the company. She alleges that "other terminated employees of BellSouth were permitted to work with other BellSouth partners immediately after termination of their employment." (Complaint, Attachment # 1 to Dkt. # 1, at ¶ 15.). Further, in her responsive pleading she asserts that "...Mr. Mattox was permitted to work for a partner company immediately after his discharge with severance despite the 90-day freeze that is supposed to be in place." (Dkt. # 36, at 11). In her affidavit, Ms. Tudor states that "[Assistant Vice President Kane] sent Mr. Mattox's resume to Authorized Communication Group, the same company Ms. Tudor went to work for, and he would not be required to wait the 90-day period before beginning employment." (Attachment # 1 to Dkt. # 36, at ¶ 7). The Court assumes this paragraph is meant to state that Mr. Kane *told* Authorized Communications Group that the 90-day waiting period would not be enforced as to Mr. Mattox. She further states that "Mr. Bosco and Mr. Broyles left BellSouth and immediately started their own company called Jabez, which [Mr. Kane] had to approve in order for them to become an agent of BellSouth. Mr. Menchise went to work for DCI." (*Id.* at ¶ 8).

Federal cases interpreting Title VII's retaliation prohibition can be used to interpret and apply the KCRA's retaliation provision. *Mountain Clay, Inc. v. Comm'n on Human Rts.*, 830 S.W.2d

395, 396 (Ky. App. 1992). To establish a *prima facie* case of retaliation in violation of Title VII, an employee must prove four elements:

> (1) [the employee] engaged in an activity protected by Title VII; (2) this exercise of protected rights was known to defendant; (3) defendant thereafter took adverse employment action against the plaintiff, or the plaintiff was subjected to severe or pervasive retaliatory harassment by a supervisor; and (4) there was a causal connection between the protected activity and the adverse employment action or harassment.

*Morris v. Oldham County Fiscal Court*, 201 F.3d 784, 792 (6th Cir. 2000) (emphasis omitted). As in the *McDonnell-Douglas/Burdine* burden-shifting scheme discussed above, if a plaintiff establishes a *prima facie* case involving an adverse employment action, the employer may avoid liability by showing that it had a legitimate, non-discriminatory reason for its actions. *Id.* at 792-93. Plaintiff must then show that this legitimate, non-discriminatory reason was merely pretextual. *Id.* at 793.

      Defendant argues that Ms. Tudor has failed to set forth a *prima facie* case as required. Specifically, it argues that Ms. Tudor has failed to prove the first and third elements of the test. It argues that she did not engage in a protected activity and that its enforcement of the waiting period policy does not constitute adverse employment action. The Court believes that failure to waive the waiting period could constitute adverse employment action if the waiting period was waived for other employees. However, the Defendant is correct in its assertion that Ms. Tudor does not make out the first prong of her *prima facie* case. Ms. Tudor asserts that:

> ...the fact that the Plaintiff had complained about her treatment in the past and then was unhappy upon termination, while male counterparts left the company with larger severance packages, leaves the possibility that the 90 [day] waiting period was applied as retaliation for Plaintiff's complaining about her treatment while at BellSouth and during her termination.

(Dkt. # 36, at 11-12). Ms. Tudor, however, has not alleged that any of her complaints were related to or based on sex discrimination. The Court's review of the documentation of these complaints reveals no evidence that issues of sex discrimination were ever mentioned. Without them, Ms. Tudor's complaints do not constitute activity protected by Title VII. *Offutt v. Warren County Regional Jail*, 109 Fed. Appx. 740 (6th Cir. 2004); *see also Hunt v. Nebraska Public Power Dist.*, 282 F.3d 1021, 1028-29 (8th Cir. 2002). Therefore, she has not made out the first prong of her *prima facie* case as required for her claim to proceed.

The Court also notes that, even if she had made out the prima facie case, the Defendant asserted its reason for termination, and the Plaintiff proceeded to attack that reason as pretextual, her retaliation claim still would not go forward. The 90-day waiting period policy went into effect in February of 2004. Plaintiff does not allege, much less demonstrate by a preponderance of the evidence, that the situation with Mr. Bosco and Mr. Broyles or the situation with Mr. Menchise occurred after that time, or that they were terminations of employment that triggered the waiting period under the policy. Aside from her own affidavit, she has no evidence to suggest that the rule was not applied to Mr. Mattox.

## CONCLUSION

For the reasons outlined above, this Court concludes that Defendant is entitled to summary judgment as a matter of law on both the claim for wrongful termination and the claim for overtime compensation. Defendant's motion for summary judgment is **GRANTED** and this case is **DISMISSED**.

An appropriate order shall issue.